UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


DANNY BROWN,                          )        Case No.: 1:10 CV 752
                                      )
        Plaintiff                     )
                                      )        JUDGE SOLOMON OLIVER, JR.
        v.                            )
                                      )
UNITED STATES OF AMERICA,             )
                                      )
        Defendant                     )        ORDER


Currently pending before the court is Defendant the United States of America's ("Defendant"

or the "Government") Motion to Dismiss and Motion for Summary Judgment (ECF No. 39).  For

the following reasons, the Government's Motion is granted in part and denied in part.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff Danny Brown ("Plaintiff" or "Brown") brought the instant action under the Federal

Tort Claims Act ("FTCA"), stating claims of malicious prosecution, intentional infliction of

emotional distress, and civil conspiracy.  Defendant's Motion for Summary Judgment is directed to

the malicious prosecution claim.  Defendant's Motion to Dismiss is directed to the civil conspiracy

and intentional infliction of emotional distress claims.  All claims are related to Plaintiff's trial and

acquittal for possession of crack cocaine with intent to distribute. (*See* Case No. 1:05-cr-537-JRA-

21.)  Plaintiff also filed a separate *Bivens* action against the Government and individual defendants,

in which the court granted summary judgment to all defendants. (*See* Order, Case No. 1:07-cv-3750,

ECF No. 184.)  Though the court has previously detailed the facts of this case (*See* Order, Case No. 1:07-cv-3750, ECF No. 160), the court will outline the facts most salient to this Motion.

### A. Background

Following the discovery of Timothy Harris's body in December 2004, the Richland County Sheriff's Office began an investigation of local known drug dealers as they believed his death was drug-related. (Order at 2, Case No. 1:07-cv-3750, ECF No. 160.)  In September 2005, the Sheriff's Office joined forces with a Drug Enforcement Agency ("DEA") task force, including DEA Agents Lee Lucas ("Lucas") and Robert Cross ("Cross").  On the recommendation of the Richland County Sheriff's Office, the DEA Agents registered Jerrell Bray ("Bray") as a confidential source.  Bray was used in several "controlled buys" set up to catch drug dealers.  This investigation was known as "Operation Turnaround."

One of these controlled buys involved Plaintiff.  On November 7, 2005, Bray made two separate recorded and monitored phone calls to Plaintiff.[1]  Based on these phone calls, DEA Agents decided to set up the controlled buy.  The next day, Bray told the Agents that Plaintiff had changed his number.  However, the new phone number actually belonged to Robert Harris ("Harris"), who was also a target of the investigation.  Bray called the new number, and falsely reported to the officers that he had spoken to Plaintiff and that Plaintiff could sell him $950.00 worth of crack cocaine.

As a result of this call, Bray met with a drug courier in his car in a blind alley.  DEA Agents Cross and Lucas accompanied him, along with a Richland County officer.  Bray was outfitted with

---

[1]    The content of these calls is disputed by the parties, and is detailed in the following section.

2

a recording device, and carried $950.00 in pre-recorded bills provided to him by the officers.  After the drug deal, Bray met with the officers, who performed a field test on the drugs to confirm that they contained cocaine.  Bray told the officers that the courier had been sent by Plaintiff.

Based on these events, Plaintiff was indicted by a grand jury on charges of possession with intent to distribute crack cocaine.  The criminal complaint against Plaintiff was supported by an affidavit completed and signed by Cross, in which Cross stated that Bray was reliable. (Cross. Aff. at ¶ 4, ECF No. 44-11.)  The affidavit also stated that Lucas and Detective Charles Metcalf ("Metcalf") of the Richland County Sheriff's Office observed an unidentified black male sent by Plaintiff enter Bray's car in the alley. (*Id.* at ¶ 10.)  Lucas testified before the grand jury as to the drug deal, stating that he heard Bray arrange the buy with Plaintiff on the phone, that he saw a black male get into the car with Bray, and that he heard Plaintiff confirm with Bray that he had sold him the crack cocaine. (Lucas Grand Jury Test., ECF No. 40.)  Lucas also testified that he heard Plaintiff tell Bray on the phone that he was cooking crack. (*Id.*)

Plaintiff was subsequently acquitted of the charges by a jury on July 26, 2006. (*See* Jury Verdict, Case No. 1:05-cr-537-JRA-21, ECF No. 547.)  Most of the other criminal defendants in Operation Turnaround were also acquitted or had their convictions vacated. In May 2007, Bray admitted that he had framed Plaintiff and a number of other individuals as a result of Operation Turnaround. (Mot. Summ. J. at 6, ECF No. 39.)  In May 2009, Metcalf pled guilty to a one-count information relating to his false testimony in the trial of Dwayne Nabors ("Nabors"), another Operation Turnaround investigation. (*See* Case No. 1:09-cr-206.)  Metcalf admitted he had falsely identified Nabors in a September 2005 drug buy. (Mot. Summ. J. at 7.)

After an intensive investigation into Lucas's role in Operation Turnaround, Lucas was

indicted by a grand jury on charges of creating incriminating evidence, withholding exculpatory evidence, and committing perjury, all in the pursuit of prosecuting those being framed by Bray, including Plaintiff. (*Id.* at 7.) Specifically, the Indictment charged Lucas with perjury in regard to his testimony at Plaintiff's trial, where he testified that he was able to see a black man enter and exit Bray's car during the controlled buy, and that he was able to identify this man as Frank Douglas. (*See* Lucas Indictment at 43-46, Case No. 1:09-cr-222, ECF No. 1.) After a two-month trial, Lucas was acquitted of all charges by a jury. (Mot. Summ. J. at 7.)

### B. Procedural History

On December 7, 2007, Plaintiff filed a *Bivens* action and several state law claims against the DEA Agents and Richland County officers, Richland County, and the City of Cleveland. (*See* Case No. 1:07-cv-3750.) In April of 2008, the United States moved the court to substitute it as the proper party defendant with respect to the common law tort claims asserted against Cross and Lucas. (Case No. 1:07-cv-3750, ECF No. 46.) The court subsequently granted the Government's Motion to dismiss those claims against it. (Case No. 1:07-cv-3750, ECF No. 117.) After an extended discovery period, the individual defendants moved for summary judgment on the constitutional claims, arguing that they were entitled to qualified immunity. The court granted that Motion as to Defendants Cross, Lucas, and Jamal Ansari, a Cleveland police officer who was deputized by the DEA for this investigation. (Case No. 1:07-cv-3750, ECF No. 160.) Upon Motion by the remainder of the defendants, the court then granted summary judgment to the Richland County officers, Richland County, and the City of Cleveland on the remaining *Monell* and state law claims. (Case No. 1:07-cv-3750, ECF No. 160.)

Plaintiff filed the instant case on April 12, 2010. (Compl., ECF No. 1.) Discovery was stayed

4

pending the court's decision of the summary judgment motions in Plaintiff's *Bivens* action. (ECF No. 31.)  After resolution of the *Bivens* case, the Government filed the instant Motion on September 16, 2013.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Though the Rule was amended in 2010, the summary judgment standards and burdens have not materially changed. *See* Fed. R. Civ. P. 56 advisory committee's notes (2010 Amendments) ("Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c)...."); *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 n. 4 (1st Cir. 2011). In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941,

5

943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.  However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim"; or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

If the moving party meets its burden of production, then the non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F.Supp.2d 866, 871 (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)).  The non-movant must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts.  *Id*. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

**B. Motion to Dismiss Standard**

The court examines the legal sufficiency of the plaintiff's claim under Federal Rule of Civil Procedure 12(b)(6). *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993). The Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009) clarified the law regarding what the plaintiff must plead in order to survive a Rule 12(b)(6) motion.

When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the Complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the Complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a Complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court in *Iqbal*, 129 S.Ct. at 1949, further explains the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

7

The Sixth Circuit has held that a court may consider allegations contained in the Complaint, as well as exhibits attached to or otherwise incorporated in the Complaint, all without converting a Motion to Dismiss to a Motion for Summary Judgment. Fed. R. Civ. P. 10(c); *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

### III. LAW AND ANALYSIS

### A. Summary Judgment

#### 1. Law of Malicious Prosecution

The FTCA waives the sovereign immunity of the United States in limited circumstances. FTCA, 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances."). The FTCA explicitly waives sovereign immunity in suits for malicious prosecution based on "acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). *See also Harris v. City of Cleveland*, 190 F.R.D. 215, 219-220 (N.D. Ohio 1999). Accordingly, the United States is amenable to suit for the malicious prosecution of Plaintiff allegedly initiated by the DEA Agents. *Harris*, 190 F.R.D. at 220. As courts "must look to the law of the state where the alleged wrong occurred to determine the liability of a private person," Ohio law applies to Plaintiff's malicious prosecution claim. *Himes v. United States*, 645 F.3d 771, 776-777 (6th Cir. 2011) (citing 28 U.S.C. § 1346(b)).

In Ohio, the elements of malicious prosecution are: "(1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the accused." *Garza v. Clarion Hotel, Inc.*, 695 N.E.2d 811, 813 (Ohio Ct. App. 1st Dist. 1997). Here, there is no question that the third element was met as Plaintiff's criminal case ended in acquittal. In

their briefs, the parties agree that this Motion turns on the existence or lack of probable cause.

While malice is the first element of the inquiry, "the want of probable cause is 'the real gist of the action.'" *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003) (quoting *Tourlakis v. Beverage Distribs., Inc.*, 2002 WL 31875970, at *4 (Ohio Ct. App. 8th Dist. Dec. 26, 2002)). If the plaintiff is able to demonstrate there was a lack of probable cause, "the legal inference may be drawn that the proceedings were actuated by malice." *Tourlakis*, 2002 WL 31875970, at *4. In the malicious prosecution context, probable cause is defined as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious [individual] in the belief that the person accused is guilty of the offense with which he [or she] is charged." *Harris v. Bornhorst*, 513 F.3d 503, 520 (6th Cir. 2008) (quoting *Rogers v. Barbera*, 164 N.E.2d 162, 166 (Ohio 1960)).

Ohio courts have generally disfavored actions for malicious prosecution, and courts have allowed recovery only when the requirements of these actions have been fully complied with. *See Dailey v. First Bank of Ohio*, 2005 WL 1483678, at *5 (Ohio Ct. App. 10th Dist. June 23, 2005). Where the plaintiff in a malicious prosecution suit has been indicted, the indictment is "prima facie evidence of probable cause and the plaintiff must bring forward enough evidence to rebut this." *Epling v. Pac. Intermountain Express Co.*, 379 N.E.2d 239, 241 (Ohio Ct. App. 9th Dist. 1977) (citing *Melanowski v. Judy*, 131 N.E. 360 (Ohio 1921)). In general, when the "plaintiff fails to show the indictment was not the result of the prosecutor's uncontrolled discretion to prosecute, he fails to rebut the presumption of probable cause raised by the indictment." *Ruff v. Runyon*, 60 F.Supp.2d 738, 749 (N.D. Ohio 1999) (citing *Robbins v. Fry*, 594 N.E.2d 700 (Ohio Ct. App. 3d Dist. 1991)). To rebut this presumption, a plaintiff "must produce evidence to the effect that the return of the

9

indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular." *Deoma v. Shaker Heights*, 587 N.E.2d 425, 428 (Ohio Ct. App. 8th Dist. 1990) (citing *Epling*, 379 N.E.2d at 241).

### 2. Areas of Dispute

Plaintiff suggests that there are four areas of disputed facts that are essential to a determination that Defendant had probable cause to institute a prosecution against Plaintiff. To provide context for the analysis of the Government's arguments, the court discusses each one briefly.

### a. The Phone Calls to Plaintiff

Plaintiff first states that Cross's report indicated that Plaintiff told Bray on the November 7 phone calls that he was cooking crack cocaine. A transcript of the recorded call shows that Plaintiff said "I'm in the making right now." (Tr. at 2, Pl.'s Ex. 6, ECF No. 44-7.) The Government states that this means Plaintiff was cooking crack. (Mot. Summ. J. at 4.) Plaintiff states that this "might arguably (though not necessarily) be construed as cooking crack." (Pl.'s Resp. at 4, ECF No. 42.) The parties also disagree on whether the DEA Agents and Richland County officers knew that the new number Bray provided for Plaintiff on November 8 actually belonged to Harris, as he was also a target of Operation Turnaround.

### b. What Lucas Saw During the Controlled Buy

Next, there is a dispute as to what Lucas saw during the controlled buy. The Government states that there is no question that Lucas saw a black male entering and exiting Bray's car during the controlled buy. (Reply at 5, ECF No. 45) Plaintiff states that Lucas did not see anyone enter or leave Bray's car because the alley was blind and because of severe rainfall at the time. (Pl.'s Resp.

10

at 6.)  Plaintiff relies on Metcalf's testimony under oath that he did not see anyone enter or leave Bray's car.  (*Id.*)  Plaintiff also points to Lucas's inconsistent testimony between Plaintiff's trial, in which he stated that the person he had seen was Frank Douglas, and Lucas's own trial, in which he stated that he could not identify the person who entered the car.  The Government states that this is not an inconsistency, as Lucas could still see a person enter the car, but could not see *who* the person was.

### c. Recording of Bray's Body Wire

Plaintiff states that Bray was recorded telling the drug courier to give the money to "Chris" instead of "Danny" (Plaintiff's name).  Plaintiff states that Cross's report purposefully left out this detail. (Resp. at 6.)  Plaintiff also states that one of the DEA Agents, probably Lucas, created a transcript of the recording from Bray's wire that is "word-for-word accurate, except for the complete omission of any reference to giving the money to 'Chris.'" (*Id.* at 6-7.)  The Government does not address this issue in its Reply.

### d. Bray's Reliability

Plaintiff also states several times that the DEA Agents knew that Bray was an unreliable informant when they decided to use him in the controlled buy with Plaintiff.  Plaintiff points to several other Operation Turnaround investigations and controlled buys that occurred prior to the investigation of Plaintiff, stating that Bray's conduct during these investigations shows he was unreliable. (Resp. at 8-11.)  For example, Plaintiff points to the phone call Bray supposedly made to Operation Turnaround target Ronald Davis, where the recording "clearly shows that he was actually speaking to a woman." (*Id.* at 8-9.)  Plaintiff states that Lucas wrote in his report that Bray was in fact talking to a woman, but "omitted the fact that Bray had lied and tried to pass the call off

11

as one to Davis so as to inculpate Davis." (*Id.* at 9.)  The Government, on the other hand, states that the DEA Agents were told by the Richland County Sheriff's Office that Bray was a reliable informant and that they had nothing but good experiences with Bray's cooperation. (Mot. Summ. J. at 3.)  The Government states that it was not until May 2007 that Bray admitted framing the Operation Turnaround suspects. (*Id.* at 6.)

### 3. Analysis

The Government argues that, because the officers in Plaintiff's criminal case had probable cause that Plaintiff had sold Bray crack cocaine in spite of any irregularities and falsehoods that later came to light, it should be granted summary judgment on Plaintiff's malicious prosecution case.  The Government first argues that the officers could properly rely on Bray's information because they had no reason to suspect Bray might be fabricating information until after Plaintiff's Indictment.  Next, the Government argues that the officers had probable cause even without Bray's false statements because they witnessed the buy, and tested the substance for crack cocaine.

Plaintiff argues that the officers had notice that Bray was an unreliable informant based on his actions before and during the investigation into Plaintiff's activities.  Plaintiff contends that several of the officers' actions taken to falsify or hide information formed the basis for the Indictment, and therefore that the officers did not have probable cause to prosecute him. Plaintiff points to a number of actions taken by the officers to hide Bray's inconsistencies and to ignore Bray's unreliability.

The court finds Plaintiff's arguments to be well-taken. Plaintiff has produced evidence, as discussed herein, indicating that there remain several material issues of disputed facts in this case. Viewing the evidence in the light most favorable to Plaintiff, the court finds that Plaintiff has met

his burden of rebutting the presumption of probable cause raised by a grand jury indictment.

Plaintiff's Indictment was almost entirely based on Cross's report of the November 8, 2005 drug buy conducted by Bray, and Lucas's testimony in front of the grand jury.  As the court discusses below, there is a genuine dispute of fact about whether both of these led to "significantly irregular" grand jury proceedings, and an indictment procured by perjury. *Deoma*, 587 N.E.2d at 428.

### a. Bray's Reliability

The Government argues that the DEA Agents were told by the Richland County Sheriff's Office that Bray was a reliable informant, and that they were entitled to rely on that information. (Mot. Summ. J. at 13.)  The Government contends that Bray's reliability only came into question "years" after Plaintiff's Indictment. (*Id.*)

However, Plaintiff has put forward enough evidence to support a finding that the DEA Agents would have known before the Indictment that Bray was an unreliable informant, even if they had been told by the Richland County Sheriff's office that he was reliable.  A jury could find that the DEA Agents were on notice that Bray was not reliable based on his actions in several other investigations that were part of Operation Turnaround.  For example, as detailed in the Department of Justice Office of the Inspector General's ("OIG") Report on Operation Turnaround in the investigation of Noel Mott ("Mott"), Bray set up a drug buy with another drug dealer on September 15, 2005 (almost two months before the drug buy involving Plaintiff), all while telling Lucas that he was buying the drugs from Mott. (OIG Report at 14, Pl.'s Ex. 12, ECF No. 44-13.). Bray told Lucas that he had spent $2,400 on the drugs when he had spent $1,620 and hidden the rest behind his steering wheel. *Id.*  Although investigators found the rest of money, and Bray admitted

he had only paid $1,620 for the drugs, Lucas's report regarding the incident omitted this fact. *Id.* In fact, Lucas's report stated that Bray returned the funds to Lucas, and that a search of Bray's car did not yield any drugs or money. *Id.*  The OIG report also details that "Lucas knowingly failed to report Bray's attempted theft of government funds, which constituted behavior which was likely to negatively impact both Bray's credibility and the DEA's ability to continue to use Bray as a confidential source." *Id.*  Bray conducted himself in the same manner in several other investigations during Operation Turnaround involving Agents Lucas and Cross that occurred prior to the investigation into Plaintiff's activities.[2]  For instance, Bray was caught stealing drugs given to him in the controlled buys, or there were discrepancies between the weights supposedly bought and those collected by Bray. The OIG Report indicates that Lucas was aware of Bray's unreliabilities.

Bray also showed that he was unreliable during the investigation into Plaintiff.  For example, during the drug buy, Bray was recorded telling the courier to "give that to Chris," even though the money was supposedly for Plaintiff Danny Brown. This statement was omitted from the transcript of the recording prepared by Lucas.  Bray also told the DEA Agents that Plaintiff had changed his number, and gave them a new phone number that in fact belonged to Robert Harris, another known drug dealer who was a target of Operation Turnaround.  Lucas's omission of information from the transcript that Bray referred to the courier as "Chris,  construed in the light most favorable to the Plaintiff, would show that he knew Bray was unreliable.  The OIG Report also shows that Lucas would likely have known, or at least should have known that Plaintiff's number had not changed as

---

[2]      *See, e.g.*, Section I.B above. *See also* Resp. at 7-17; OIG Report at 8 (Lowestco Ballard buy, which occurred on September 9, 2005), 10 (Ronald Davis/Geneva France buy, which occurred on October 25, 2005), 13 (Joshawa Webb buy, which occurred on October 14, 2005).

14

Bray had used these tactics before, and that Lucas had previously lied on his reports about checking the phone numbers given to him by Bray. (*See, e.g.* OIG Report at 10-11.)  These facts, along with many others, suggest that Plaintiff has met his burden of showing that Bray was unreliable, that the DEA Agents knew he was unreliable before they used him for the controlled buy in the investigation of Plaintiff, and that there was no probable cause based on Bray's representations in the investigation.

These facts also differ vastly from those in *United States v. Williams*, 56 F.3d 66 (6th Cir. May 24, 1995) (table), the case on which the Government relies for the proposition that the reliability of confidential informants may be verified by other police officers.  In *Williams*, the officer who prepared the affidavit for the search warrant had no reason to believe the informant was unreliable.  In *Mott v. Mayer*, 179 Fed. App'x 179 (6th Cir. 2013), however, the district court found that the DEA Agents could not have relied on Bray's information as it was unreliable and uncorroborated. *Mott*, 179 Fed. App'x at 187.  For the same reasons, the court finds that Plaintiff has provided sufficient evidence that could lead a jury to find that the Bray was unreliable and could not have provided information to support probable cause.

### b. Corroboration of Bray's Drug Buy

The Government also argues that even if Bray was unreliable, "the officers' corroborative efforts made on the day of the buy alone established probable cause." (Mot. Summ. J. at 14.)  The Government relies on *United States v. Coffee*, 434 F.3d 887 (6th Cir. 2006), in which the Sixth Circuit concluded that a confidential informant's reliability had been confirmed based on the events surrounding a controlled drug purchase.  In *Coffee*, the informant had purchased crack cocaine from the defendant with pre-recorded funds after being searched to make sure he had no drugs or money

15

on him. *Coffee*, 434 F.3d at 891. The informant was observed entering the house where the defendant was said to reside, and was heard making the drug buy with the defendant on a wire he was wearing. *Id.* The drugs were then field-tested and tested positive for crack cocaine. *Id.*

The Government's reliance on *Coffee* is misplaced.  Contrary to the Government's contention that "[t]he drug buy allegedly involving Brown contained all the corroborative elements present in *Coffee*" (Mot. Summ. J. at 15.), in this case, Bray was not observed going to Plaintiff's house for the drug buy.  Instead, the drug buy happened in an alley that was not near Plaintiff's house. More importantly, the officers in *Coffee* heard the defendant's voice on the wire the informant was wearing.  In this case, not only did the DEA Agents not hear Plaintiff's voice, but they heard Bray refer to "Chris" as the intended recipient of the money. Finally, in *Coffee*, the informant was seen leaving the house with the defendant.  In this case, Plaintiff was never seen by the DEA Agents.

*Coffee* can be further distinguished because, again, the DEA Agents had notice that Bray was unreliable and had previously lied to them in the context of other Operation Turnaround investigations.  In *Coffee*, however, the court was addressing the defendant's argument that the informant's veracity had not been sufficiently detailed in the affidavit supporting a search warrant. The Sixth Circuit thus evaluated the corroborative actions taken to show that the informant's veracity had been verified.  Here, the corroborative actions taken by the DEA Agents must be examined in their context.  Unlike in *Coffee*, the DEA Agents here were aware of Bray's unreliability.  Therefore, to ensure enough corroboration of Bray's information, the DEA Agents would have had to do more than send Bray in with money and field-test the drugs.  At a minimum, they would have had to ensure the number Bray called was in fact Brown's and that the courier was

16

in fact working for Brown when they heard Bray refer to "Chris" on the wire.

The rule in *Coffee* is simply that in the case where the informant's veracity has not been verified, probable cause may still exist if there was sufficient corroboration. The sufficiency of the corroboration is based on the "totality of the circumstances." *Id.* at 894. *See also United States v. Yates*, 501 Fed. App'x 505, 510 (6th Cir. 2012).[3]  Therefore, while the corroboration in *Coffee* may have been sufficient based on the totality of the circumstances in that case, the circumstances in the instant case require a different level of corroboration to ensure that Bray's information supported a finding of probable cause.  Based on this, a jury could find that the DEA Agents' corroboration of Bray's information was not sufficient to support probable cause.

### c. Cross's Report

Defendant relies on the presumption that probable cause exists where a grand jury returned an indictment. (Mot. Summ. J. at 12.)  As previously discussed, a plaintiff may rebut this presumption by producing "evidence to the effect that the return of the indictment resulted from perjured testimony or that the grand jury proceedings were otherwise significantly irregular." *Deoma*, 587 N.E.2d at 428.

Plaintiff states that the report of the investigation prepared by Cross, and the affidavit signed by Cross in support of Plaintiff's arrest, contained "false statements and significant omissions to airbrush out all of the salient, exonerating facts." (Resp. at 5.)  In particular, Plaintiff points to the

---

[3]  The Government also relies on *Yates* to bolster their corroboration argument. However, as with *Coffee*, this reliance is misplaced. In *Yates*, the officer had observed the defendant's car in the driveway of the home where the drug buy had occurred.  In addition, a subpoena issued prior to the search warrant being issued identified the defendant as being the subscriber for the utilities at the home. Finally, the informant in *Yates* did not have a history of being unreliable.

fact that the report states that Plaintiff was "cooking the crack" when he did not actually say this in the recording (*see* Tr. of Conversation at 2, Pl.'s Ex. 6, ECF No. 44-7); that the report omits the fact that Bray tried to call Plaintiff twenty-eight times on November 7, 2005, and that Plaintiff did not answer; that the report omits that when Bray claimed that Plaintiff had changed his number, the new number he gave the DEA Agents actually belonged to Harris, a known drug dealer; that Metcalf observed the person who entered Bray's car to sell him drugs[4]; and that Bray identified the supplier of the drugs as "Chris."[5] (*Id.* at 5-7. *See also* Cross Report, Pl.'s Ex. 8, ECF No. 44-11.)

Cross's report was then attached to the criminal complaint that formed the basis for Plaintiff's Indictment.  The Complaint was signed by Cross. (Criminal Compl. at 1, Pl.'s Ex. 10, ECF No. 44-11.)  Cross also attached an affidavit to the Complaint in which he repeated the information contained in the report, including that Brown was "cooking the crack." (*Id.* at 3-5.)

The evidence Plaintiff has provided surrounding the irregularities in Cross's report indicate that a jury could find that the Indictment was based on grand jury proceedings that were significantly

---

[4]  As noted in the Facts section of this Order, Metcalf later testified under oath that he did not see anyone enter the car. Lucas maintains that he did see someone enter the car. Metcalf also told the Department of Justice's Office of the Inspector General ("OIG"), which investigated Lucas following the fallout from Operation Turnaround, that "he and Lucas never saw Bray's car again after it turned into the alley." (OIG Report at 12.)  The OIG Report "determined that Lucas knowingly gave false testimony during Brown's trial." (*Id.*)  The OIG Report focuses on Metcalf's admissions, as well as the inconsistencies between Lucas's testimony at Plaintiff's trial and at his own trial. (*Id.*)  In particular, the OIG Report states that Lucas can be heard on Bray's wire after the controlled buy asking Bray if the buy had occurred at "Raymond and Mulberry," a location approximately two blocks from where the buy actually happened. (*Id.*) The OIG Report concludes from this that Lucas must not have seen the buy. (*Id.*)

[5]  Plaintiff also points to the fact that the transcript of Bray's wire omitted that he referred to the drug supplier as "Chris" instead of "Danny." (*See* Tr. of Conversation at 9, ECF No. 44-7.)

18

irregular.  Cross's report and subsequent criminal complaint contain several troubling inaccuracies and omissions that could have led the grand jury to determine probable cause existed where it did not.

### d. Lucas's Testimony to the Grand Jury

Plaintiff also points to evidence that Lucas perjured himself in his testimony to the grand jury.  (Resp. at 17-18.)  Plaintiff argues that Lucas was the "driving force behind the charges instituted against Mr. Brown." (*Id.* at 17.)  Plaintiff contends that the Assistant United States Attorney who prosecuted Plaintiff "conducted no oversight, no independent corroboration, or investigation in support of the indictment, instead relying exclusively on Agent Lucas." (*Id.*)

In his testimony before the grand jury, Lucas stated that he heard Plaintiff tell Bray on November 7, 2005, that Plaintiff was "cooking the crack." (Lucas Grand Jury Tr. at 4, ECF No. 40.) Lucas then stated that "on November 8, 2005, we again ...made tape recorded calls to Danny Brown at 419-610-5399." (*Id.*) As indicated earlier, there is evidence from which one could conclude that the call was not being made to Plaintiff. Similarly, Lucas did not tell the grand jury that this was a different number than the one used the day before, indicating that he may have purposefully omitted that fact.  Furthermore, Lucas also omitted the fact that Plaintiff had said that he did not have crack cocaine on him on November 7.

Lucas also described the transaction in the alley to the grand jury, but did not mention that Bray had referred to the seller of the crack as "Chris." (*Id.* at 5.)  Lucas stated that he had seen the courier enter and leave Bray's car, but, as discussed earlier, Plaintiff has presented evidence that he had not seen this happen. (*Id.*)  Lucas then again told the grand jury that Bray had called the 419-610-5399 number to tell Brown that the amount of crack was a little short. (*Id.* at 6.)  Assistant U.

S. Attorney ("AUSA") Blas Serrano ("Serrano"), the prosecutor in Plaintiff's criminal case, later testified that he relied on Lucas's representations in pursuing the Indictment against Plaintiff, and that he did not perform any separate inquiries into the information provided to him by Cross and Lucas. (Serrano Test. at 3-5, Pl.'s Ex. 49, ECF No. 44-50.)

The discrepancies between Lucas's testimony to the grand jury and his knowledge of the facts at the time are enough to create a question of fact for a jury to decide.  A jury could find that probable cause did not exist because the grand jury's Indictment resulted from perjured testimony or significantly irregular proceedings.  The court notes that the statements and omissions surrounding what was recorded from Bray's phone calls and body wire are particularly troubling. The court also notes that there remains a question of fact about whether Lucas did in fact see the courier, as Metcalf testified that he did not see him.  Finally, the court notes that there is a question of fact as to whether Lucas knew that the new phone number Bray provided actually belonged to Harris, who was also under investigation as part of Operation Turnaround.

As AUSA Serrano testified that he relied principally on the reports of the investigations and Lucas's representations in seeking indictments in Operation Turnaround cases, a jury could also find that Cross's questionable report and Lucas's false testimony provided the basis for the Indictment, thereby rebutting the presumption of probable cause.

Taking into consideration all of the evidence produced by Plaintiff, the court concludes that Plaintiff has met his burden of showing that there are disputed issues of material fact.  Therefore, the Government's Motion for Summary Judgment (ECF No. 39) is denied.

**B. Motion to Dismiss**

<u>1. Civil Conspiracy Claim</u>

20

The Government argues that Plaintiff's civil conspiracy claim should be dismissed as Plaintiff has failed to state a claim upon which relief can be granted.  The Government argues that "[h]is claim has so little foundation that it is hard to tell whether he in fact alleges it, let alone supported adequately by facts rendering it plausible." (Mot. Summ. J. at 20-21.)  In the alternative, the Government argues that, because his malicious prosecution claim fails, and because a civil conspiracy claim requires an unlawful independent act independent of the actual conspiracy, his civil conspiracy claim must also fail. (*Id.* at 21.)

Plaintiff argues that he has properly pled his civil conspiracy claim as he has pled all of the elements of a conspiracy claim under Ohio law. (Resp. at 28-30.)  Plaintiff also contends that because the Government had notice of the allegations against it based on Plaintiff's *Bivens* action, Plaintiff's conspiracy allegations were "well-documented" and to grant a Motion to Dismiss "would be form over substance in the extreme." (*Id.* at 28.)  In the alternative, Plaintiff asks the court to grant him leave to amend his Complaint should the court find greater specificity is required. (*Id.*)

Under Ohio law, a civil conspiracy claim is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."  *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 9th Dist. 1996) (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995)).  The elements that must be proven are: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio 1933).

Before a civil conspiracy claim can proceed, there must be an "underlying unlawful act." *Gosden*, 687 N.E.2d at 496. (citing *Minarik v. Nagy*, 193 N.E.2d 280, 280-81 (Ohio 1963)).  As

21

discussed above, the court has found that there is a question of material fact remaining as to Plaintiff's malicious prosecution claim.  At this stage of the litigation, there remains an underlying unlawful act.  Therefore, the court rejects the Government's argument that Plaintiff's civil conspiracy claim must be dismissed because there was no malicious prosecution underlying it.

The court also finds the remainder of Plaintiff's arguments to be well-taken.  Plaintiff's Complaint contains specific indications that he is pleading a conspiracy claim.  Plaintiff states that "the Defendant's agents, acting personally, as well as by and through a conspiracy with others, coached and manipulated witnesses, and then withheld from the prosecutors the details of how they had done so." (Compl. at ¶ 11, ECF No. 1) Plaintiff goes on to allege that "Defendant's agents also reached an agreement to deprive Mr. Brown of his constitutional rights via illicit means, and one or more of them took actions in furtherance of this conspiracy." (*Id.* at ¶ 21.)  Plaintiff pleads specific facts regarding each element of a civil conspiracy claim. Plaintiff describes how the DEA Agents worked together to set up Plaintiff using Bray, and manipulated and misrepresented audio recordings. (*Id.* at ¶¶ 7-8.) Plaintiff also states that he was wrongly prosecuted because of these actions. (*Id.* at ¶ 5.)  These facts adequately support Plaintiff's burden as they show there were two or more persons (the DEA Agents and other local officers), that the persons intended to injure him, and that the unlawful act of malicious prosecution was underlying these actions.  The allegations state "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Twombly*, 550 U.S. at 555.

The Government cites another case related to Operation Turnaround where plaintiff's civil conspiracy claim was dismissed where he failed to make specific allegations of a plan or agreement. (Reply at 8.)  However, under Ohio law, an express agreement is not a necessary element of a

22

conspiracy claim. *See Gosden*, 687 N.E.2d at 496.  In fact, "not even a meeting is necessary and ... 'it is sufficient that the parties in any manner come to a mutual understanding that they will accomplish the unlawful design.'" *Id.* (quoting *Pumphrey v. Quillen*, 141 N.E.2d 675, 680 (Ohio 1955)). Here, Plaintiff has adequately pleaded that the Government's agents acted together with a goal to frame Plaintiff.  The court further notes that in the case cited by the Government, the plaintiff had already been arrested and incarcerated by the time the Government's agents joined the case. (*See* Order at 11-12, Case No. 1:07-cv-3518, ECF No. 172.)  Therefore, the court denies the Government's Motion to Dismiss Plaintiff's civil conspiracy claim.

## 2. Intentional Infliction of Emotional Distress Claim

The Government also argues that Plaintiff's intentional infliction of emotional distress claim must be dismissed for failure to state at claim. (Mot. Summ. J. at 19-20.)  Plaintiff has not responded to this argument.   Plaintiff's Complaint only contains conclusory allegations regarding any intentional infliction of emotional distress claim. Plaintiff alleges that "Defendant's agent's misconduct constitutes malicious prosecution and intentional infliction of emotional distress in that they caused Mr. Brown to be prosecuted for a crime he did not commit, all without probable cause." (Compl. at ¶ 16.)  Plaintiff also alleges that he suffered damages, including "emotional distress as a result of the fraudulent evidence that was admitted." (*Id.* at ¶¶ 18, 23.)

The court finds the Government's argument to be well-taken.  Under Ohio law, a plaintiff pleading a claim of intentional infliction of emotional distress must allege facts showing that the conduct was "extreme and outrageous."  *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 713-14 (Ohio Ct. App. 10th Dist. 2009) (citations omitted). Here, Plaintiff has not alleged facts showing that the conduct was extreme and outrageous, or "so outrageous in character, or so extreme

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Thomas v. Progressive Cas. Ins. Co., Inc.*, 969 N.E.2d 1284, 1288 (Ohio Ct. App. 2d Dist. 2011) (quoting *Yeager v. Local Union 20*, 453 N.E.2d, 666, 666 (Ohio 1983)).  While the facts alleged certainly support the conclusion that DEA Agents conducted their investigations in an inappropriate manner, they do not support a claim for intentional infliction of emotional distress.  Therefore, the court grants the Government's Motion to Dismiss as to Plaintiff's claim for intentional infliction of emotional distress.  *See Morrow*, 915 N.E.2d at 714 ("Whether conduct is 'extreme and outrageous' is initially a question of law for the court. A trial court may dismiss a claim for intentional infliction of emotional distress ... where the alleged conduct does not, as a matter of law, reach the level of 'extreme and outrageous' conduct." (citations omitted)).

## IV. CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss and Motion for Summary Judgment (ECF No. 39) is granted in part and denied in part.  The Government's Motion to Dismiss Plaintiff's intentional infliction of emotional distress claim is granted. The Motion for Summary Judgment is denied, and the Motion to Dismiss Plaintiff's civil conspiracy claim is denied.  This matter is referred to Magistrate Judge Baughman for mediation to be conducted before September 30, 2014.  The court will hold a final pretrial conference in the within case on October 2, 2014, at 10:00 a.m.  Trial shall commence on October 14, 2014, at 9:00 a.m.  A separate trial order shall issue.

IT IS SO ORDERED.

/s/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

August 26, 2014